IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| JOHN C. BALDWIN,<br><br>    Plaintiff,<br><br> vs.<br><br>UNION PACIFIC RAILROAD CO.,<br><br>    Defendant. | 8:22CV87<br><br>**MEMORANDUM AND ORDER** |

This matter comes before the Court on Plaintiff's, John C. Baldwin's, motion for new trial. Filing No. 209. This is an action for disability discrimination in employment under the Americans with Disabilities Act, 42 U.S.C. § 12112 et seq. Baldwin's claims for disability discrimination and Union Pacific's affirmative defenses of direct threat and business necessity were tried to a jury in November 2023. The jury returned a verdict in favor of Baldwin on his disparate-treatment claim but in favor of Union Pacific on its direct threat defense. For the reasons set forth herein, the motion for a new trial is denied.

**I. BACKGROUND**

At trial, the evidence showed Baldwin worked as an electrician and later electrician federal inspector for Union Pacific beginning in 1997. Filing No. 195 at 24–25; Trial Exhibit 304. In 2010, Baldwin had hip replacement surgery due to degenerative arthritis but continued his work as an electrician without restrictions. Trial Exhibit 1 at 1–2. On June 28, 2016, Baldwin's supervisor observed him performing work in a tight locomotive compartment while wearing a Tyvek suit. *Id.* at 7. The supervisor reported to the director of locomotive operations at Hinkle, J. Russell Lowe, that Baldwin was sweating, cramping, and limping. Filing No. 195 at 31–34.

1

Lowe subsequently referred Baldwin for a supervisor-initiated fitness-for-duty evaluation with Union Pacific's health and medical services. Filing No. 195 at 37; Trial Exhibit 14. After the fitness-for-duty evaluation, Baldwin was referred for an occupational medical evaluation with Dr. James Fulper who concluded Baldwin could return to work with no restrictions. Trial Exhibit 1 at 7, 10. However, Union Pacific had remaining concerns about Baldwin's weakness and stamina, and its chief medical officer, Dr. John Holland, ordered Baldwin to undergo an exercise tolerance test and functional capacity evaluation. *Id.* at 10–11.

Baldwin scored 7 METS on the exercise tolerance test pursuant to the Bruce protocol. Trial Exhibit 49 at 2. The ETT was negative for ischemia but noted a hypertensive response and a deconditioned state. *Id.* Holland testified an employee with an ETT lower than 8 METS has a "low aerobic capacity" and consequently requires ongoing work restrictions of "no more than light physical work." Filing No. 196 at 129. In contrast, Baldwin's functional capacity evaluation concluded he met all the physical requirements for his electrician job. Trial Exhibit 44.

Holland issued a memo on his fitness-for-duty determination on August 26, 2016. Trial Exhibit 49. He stated he had received and reviewed Fulper's occupational medicine evaluation, the ETT, and the functional capacity evaluation. Trial Exhibit 49 at 2. Holland opined that Baldwin "in his statement to Dr. Fulper appears to minimize his problems walking." *Id.* at 3. Holland stated that Baldwin's ETT "shows a moderately low level of aerobic condition." *Id.* This, combined with the fact Baldwin is obese, meant that, in Holland's opinion, "he could only safely do physical exertion in a light work category." *Id.* Holland also expressed concern about Baldwin's "significant blood pressure elevation at maximal exercise" posing a significant risk of a "cardiovascular event." *Id.* Holland

concluded that "Baldwin's low level of aerobic conditioning and his overall low level of physical conditioning, pose significant, imminent and unacceptable safety risk to him and others if he were to work as a Diesel Electrician, or in similar jobs." *Id.*; Filing No. 196 at 128–30. Consequently, Holland imposed the following work restrictions: not operating vehicles, not working on or near moving trains, not operating cranes, and not working at unprotected heights above four feet. Trial Exhibit 49 at 3. Lacey Kavan, the senior director of operation support concluded Baldwin's restrictions could not be accommodated. Trial Exhibit 53.

Baldwin spoke with Holland about the work restrictions in a phone call in early September 2016. Trial Exhibit 1 at 15. As a result of this phone call, Holland agreed to issue a revised fitness-for-duty memo and to allow Baldwin to take a second ETT. *Id.* Holland issued the revised memo on October 20. Trial Exhibit 69. He removed the restriction on operating cranes; maintained the restrictions on driving, working near moving trains, not working at heights; and added restrictions for climbing on and off locomotives, not performing prolonged work in high heat and humidity, and not performing working involving more than light physical exertion. *Id.* at 3. Kavan again indicated the restrictions interfered with Baldwin's essential job functions and could not be accommodated. Trial Exhibit 71.

Baldwin underwent a second ETT on November 22, 2016. Trial Exhibit 84; Trial Exhibit 102 at 3. This time, Baldwin scored 8.1 METS. Trial Exhibit 83. The test was stopped due to "[s]ymptoms of fatigue and leg turnover rate." *Id.* at 1. Baldwin showed "[f]air conditioning and no ischemic chest symptoms" but the report indicated "suspect[ed] HTN [high blood pressure] and diffuse myocardial wall stress mechanism." *Id.*

Holland reviewed the results of the second ETT and noted Baldwin's "slight improvement in aerobic capacity." Trial Exhibit 87 at 1; Trial Exhibit 102. He concluded the test nevertheless showed "multiple borderline ECG abnormalities with exercise, that reversed after 1-2 minutes of rest." Trial Exhibit 87 at 1. Holland said that a cardiologist who had reviewed the second ETT results, Dr. Edward Ricketts, indicated it "was not normal and raised underl[y]ing concerns that required further clinical evaluation." *Id.* Based on these results, Holland declined to change Baldwin's work restrictions. *Id.*

On December 1, 2016, Union Pacific requested a record review of Baldwin's fitness-for-duty determination by Dr. Brian Lowes, a heart failure specialist at the University of Nebraska. Trial Exhibit 92. Lowes reviewed Baldwin's two ETTs and Holland's updated fitness-for-duty memorandum. Trial Exhibit 106. Lowes concluded that Baldwin's exercise capacity was not normal for his age, and he lacked the exercise capacity to do his job without excessive fatigue, although he stated "[h]is risk of acute sudden incapacitation is likely not significantly elevated." *Id.* at 1. He opined that "[w]orking under extreme environmental conditions would increase his risk of cardiovascular events." *Id.* at 2. Thus, he concluded "[i]t would be reasonable for Mr. Baldwin to perform sedentary work at 60% of his aerobic capacity in a controlled environment (indoor or office)." *Id.* Union Pacific maintained the previously imposed restrictions, and Baldwin was consequently unable to return to his job as an electrician.

Baldwin testified that he had difficulty working in the locomotive on the day he was flagged for a FFD evaluation because of the high temperatures and cramped conditions, and that his hip issues were the limiting factor in completing the ETTs, not any heart issues. Filing No. 197 at 218–22.

The Court instructed the jury on Baldwin's causes of action: disparate treatment based on an actual disability, disparate treatment based on a perceived disability, disparate treatment based on a record of disability, disparate treatment based on a qualification standard, and failure to accommodate. Filing No. 184 at 19–29. The Court also instructed the jury on Union Pacific's defenses of direct threat and business necessity and provided an instruction on "business judgment." Id. at 30–33.

The jury returned a verdict in favor of Union Pacific on Baldwin's claims for disparate treatment based on an actual disability, disparate treatment based on a record of disability, disparate treatment based on a qualification standard, and failure to accommodate. Filing No. 192 at 1–2. It found for Baldwin on his claim of disparate treatment based on a perceived disability but found for Union Pacific on its affirmative defense that Baldwin posed a direct threat. Id. Accordingly, the jury awarded no damages. Id. at 3.

II.  **ANALYSIS**

Baldwin argues he is entitled to a new trial for two primary reasons: the evidence does not support the jury's verdict and the jury instructions were erroneous. The Court will address these alleged errors in turn after setting forth the applicable legal framework.

**A. Standard of Review**

A motion for new trial is governed by Federal Rule of Civil Procedure 59. The standard for granting a new trial is whether the verdict is against the great weight of the evidence. Butler v. French, 83 F.3d 942, 944 (8th Cir. 1996). "[M]otions for new trials are generally disfavored." Williams v. Baum, 48 F.4th 571, 573 (8th Cir. 2022). The key question is whether a new trial is necessary to prevent a "miscarriage of justice," which is a "stringent standard." Id. "In determining whether to grant a new trial, a district judge is

5

not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 465 (8th Cir. 2016). "Unless justice requires otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial . . .. At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61.

"Where a party contends that an instruction was improperly given to the jury, reversal is appropriate only where the erroneously given instruction affects substantial rights." *Am. Fam. Mut. Ins. Co. v. Hollander*, 705 F.3d 339, 355 (8th Cir. 2013) (quoting *Harrell v. Madison Cnty. Miss. Mote Co.*, 370 F.3d 760, 762 (8th Cir. 2004)). The appropriate inquiry is whether the instructions "taken as a whole and viewed in light of the evidence and the applicable law, fairly and adequately submitted the issues in the case to the jury." *Wallace v. Pharma Medica Rsch., Inc.*, 78 F.4th 402, 406 (8th Cir. 2023) (quoting *Barkley, Inc. v. Gabriel Bros., Inc.*, 829 F.3d 1030, 1042 (8th Cir. 2016)).

### B. Applicable Law

Under the ADA, an employer shall not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination includes "utilizing standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability" or "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b). To establish an ADA violation, a plaintiff must show (1)

6

that he or she was disabled within the meaning of the ADA; (2) that he or she was qualified to perform the essential functions of the job with or without a reasonable accommodation; and (3) a causal connection between an adverse employment action and the disability. *Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 545 (8th Cir. 2021). "Disability" is defined as "a physical or mental impairment that substantially limits one or more major life activities of such individual"; "a record of such an impairment"; or "being regarded as having such an impairment." 42 U.S.C. § 12012(1).

Employers "may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." 42 U.S.C. § 12113(b). "The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). The Code of Federal Regulations expands on the definition of "direct threat" as follows:

> Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
>
> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur; and
>
> (4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r); *see also Nunes v. Wal–Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999) (imposing similar standards). The employer bears the burden of proving a

7

direct-threat affirmative defense to a charge of discrimination. *E.E.O.C. v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007).

### C. Insufficient Evidence

Baldwin sets forth various arguments for why he believes the evidence was insufficient to support the jury's verdict or why the jury's verdict is inconsistent. First, he argues Union Pacific offered no evidence to support its direct threat affirmative defense because 1) the evidence Baldwin failed the 10 Mets ETT standard was not sufficiently individualized to constitute direct threat evidence; 2) Union Pacific failed to prove a significant risk of harm; 3) Union Pacific did not show it conducted an individualized assessment of Baldwin's risk of harm before imposing work restrictions; 4) Union Pacific disregarded the best available evidence; 5) Union Pacific offered no proof of the factors set forth in the regulations: the duration of the risk, the nature and severity of the potential harm, the likelihood that the potential harm will occur, and the imminence of the potential harm. Baldwin also argues the jury's verdict on Baldwin's unlawful screening claim is against the weight of the evidence and inconsistent.

The evidence presented at trial belies Baldwin's arguments about the sufficiency of the evidence; Union Pacific presented adequate evidence to support the jury verdict in favor of its direct-threat affirmative defense. Baldwin's supervisor observed him to have exhibited difficulties on the job, including unsteady walking, trouble climbing ladders, and fatigue and weakness. Filing No. 196 at 142–48; Trial Exhibit 14. Baldwin obtained unsatisfactory results on the ETTs and exhibited a hypertensive response and poor physical conditioning. Trial Exhibit 49; Trial Exhibit 83. Holland testified that he relied on medical literature indicating a hypertensive response to exercise and low exercise capacity (such as achieving under 10 METS on the ETT) was a powerful predictor of

cardiovascular events. Filing No. 196 at 134–45. Based on all these factors, Holland concluded that Baldwin would have been at risk of an "adverse cardiovascular event, that might occur if he were to do prolonged work of moderate to strenuous" that was required of his job. Filing No. 195 at 223–24, 241–44; Filing No. 196 at 134, 147; Trial Exhibit 7. Dr. Lowes, the UNMC cardiologist, also concluded that Baldwin's exercise capacity was not normal for his age and that exertion would increase the risk of an adverse cardiovascular event. Filing No. 198 at 17–59; Trial Exhibit 106. Taken as a whole, this is sufficient to demonstrate that Union Pacific undertook a timely, individualized assessment and concluded Baldwin posed a direct threat to safety based on the required factors.

Baldwin's argument Union Pacific did not rely on the best available evidence asks the Court to discredit Holland's testimony in its entirety and find the jury should not have relied on it in reaching its verdict. But the district court "is not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Lincoln Composites, 825 F.3d at 465. The jury apparently believed Holland and because his testimony, in conjunction with the other evidence, supports the jury's verdict, the Court is not free to grant a new trial on that basis.

The Court also disagrees that the jury's verdict is inconsistent and that the verdict on Baldwin's unlawful screening claim is against the weight of the evidence. Baldwin chose to present a multifaceted case by simultaneously arguing that he was discriminated against on the basis of actual, perceived, and record of disabilities and that he suffered disparate treatment based on a qualification standard. The jury apparently believed that he had been discriminated against only on the basis of a perceived disability and rejected

9

his other claims. There are various reasons the jury could have so determined, such as disbelieving there was a qualification standard at all or concluding any standard did not have a tendency to screen out disabled persons. A mixed verdict alone is not proof of an inconsistent verdict or a fault in the evidence. Furthermore, because the jury found for Union Pacific on its direct threat defense, any dispute about its reasoning on Baldwin's claims is rendered moot. The Court is not required to speculate on the basis for the jury's determination when it is grounded in the evidence presented at trial and when an affirmative defense precludes liability. While Baldwin argued for a different theory of the case, the fact the jury did not buy his argument does not render the verdict inconsistent or unsupported by the evidence. Lastly, to the extent Baldwin's argument is premised on the supposed internal incompatibility of the jury's verdicts (e.g., finding that he did not have an actual disability but that he posed a direct threat), he waived such argument by not objecting to the verdict when it was delivered. *See* Spencer v. Young, 495 F.3d 945, 950 (8th Cir. 2007) ("[F]ailure 'to object to any asserted inconsistencies [or to] move for resubmission of the inconsistent verdict before the jury is discharged' waives the right to a new trial." (alteration in original) (quoting Brode v. Cohn, 966 F.2d 1237, 1239 (8th Cir. 1992))).

### D. Erroneous Jury Instructions

Baldwin next argues the jury instructions were erroneous because 1) they misled the jury on the applicable burdens of proof; 2) the court gave an instruction on business judgment that conflicted with the direct threat instruction; and 3) the instruction on Baldwin's unlawful screening claim misstated the law.

The jury instructions, taken as a whole, correctly state the law. While the burden of proof was not explicitly stated in Instruction 29 regarding direct threat, the instruction

as a whole makes clear that it is Union Pacific who is required to demonstrate the necessary elements. First, the instruction is titled a "Defense." Second, the only logical reading of the instruction is that Union Pacific is required prove Baldwin posed a threat; it is a nonsensical and strained reading to construe the instruction to require Baldwin to present evidence of his own risk of being a threat. Third, certain of the instructions on Baldwin's claims were similarly worded in that they did not expressly repeat it was Baldwin's burden to prove his claims, and therefore this affirmative defense instruction is consistent. *See, e.g.*, Filing No. 184 at 19 (Instruction 16 regarding disparate treatment based on an actual disability, worded similarly to Instruction 29).

Baldwin also argues the business judgment instruction conflicted with the direct threat instruction. Instruction 27 on business judgment required the jury not to return a verdict for Baldwin "just because you might disagree with the defendant's decision or believe it to be harsh or unreasonable." Baldwin argues this contradicts the standard for direct threat which requires a determination of direct threat to be based on a "reasonable medical judgment." Filing No. 210 at 32. These instructions are not contradictory. The business judgment instruction makes it clear that the harshness or unreasonableness of the employer's decision cannot be the sole reason for finding for the employee, but it does not preclude the jury from thereafter correctly applying the direct threat standard as enumerated in Instruction 29. Furthermore, the fact the jury found for Baldwin on one of his claims but not the others is evidence that it correctly based its decision on an application of the instructed law as to each separate claim rather than a misapprehension that the business judgment instruction prevented it from finding for Baldwin as he implies. There is no error in Instruction 27 on business judgment.

Lastly, the instruction regarding the unlawful screening claim did not misstate the law. The Court correctly instructed that Baldwin was required to prove both a qualification standard and Union Pacific's intent to discriminate when advancing a theory of disparate treatment by means of a qualification standard. That the Court laid out the various ways Baldwin could do this did not mean it set out conflicting burdens of proof as he claims; the instruction is clear that Baldwin can prove discriminatory intent either by showing the screening standard was facially discriminatory *or* by showing it was used as a pretext. Furthermore, because the jury found for Union Pacific on its direct threat defense, any alleged error in the unlawful screening instruction is harmless.

### III.    CONCLUSION

The Court finds there is no miscarriage of justice such as to warrant a new trial. The jury instructions, taken as a whole, fairly and adequately presented the issues to the jury, and there is sufficient evidence to support the jury's verdict. Accordingly,

IT IS ORDERED:

1. Plaintiff's motion for new trial, Filing No. 209, is denied.

Dated this 25th day of September, 2024.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge